Mercedes McCAMBRIDGE and Richard L. Lawrence,
Executor of the Estate of John Lawrence Markle *v.* The
CITY OF LITTLE ROCK; Arkansas Gazette Company;
Attorney General Steve Clark; Little Rock Newspaper, Inc.,
Intervenors

87-352 766 S.W.2d 909

Supreme Court of Arkansas
Opinion delivered March 13, 1989
[Rehearing denied April 17, 1989.*]

---

*Purtle, J., would grant rehearing.

220

*Bell, Bilheimer & Associates, P.A.,* by: *Harvey L. Bell* and *Stephen P. Bilheimer,* for appellant Mercedes McCambridge.

*William L. Owen,* for appellant Richard L. Lawrence.

*Mark Stodola, City Attorney,* for appellees City of Little Rock and Sgt. Edward Alexander.

*Rose Law Firm, A Professional Association,* by: *Phillip Carroll,* for intervenor The Arkansas Gazette Company.

*Steve Clark,* Att'y Gen., by: *Jeffery A. Bell,* Deputy Att'y Gen. and *Connie C. Griffin,* Asst. Att'y Gen., for intervenor Attorney General Steve Clark.

*Wright, Lindsey & Jennings,* for intervenor Little Rock Newspapers, Inc.

ROBERT H. DUDLEY, Justice. The primary issue in this case is whether the constitutional right to privacy should bar disclosure of public records which would otherwise be available for public inspection under the Arkansas Freedom of Information Act.

## I. *FACTS*

Richard Lawrence, an attorney, testified at trial that he received a telephone call from his client, John Markle, at four o'clock on the morning of November 16, 1987. Lawrence disclosed to the police what Markle had said, but, asserting the attorney-client privilege at trial, refused to testify to more than that Markle asked him to come to his residence at 1820 Main Street in Little Rock. After Markle hung up, Lawrence tried to call him back, but was unsuccessful. Although we do not know from the trial testimony what Markle told Lawrence, it must have been alarming for it caused Lawrence to call the police to request that a patrol unit meet him at the Markle residence. Markle was in serious financial trouble and possibly faced criminal charges. When Lawrence arrived at the house, he found no policemen, so he circled the block and then noticed two patrol cars at a Safeway store at 17th and Main Streets. Lawrence described his plight to the officers, and Patrolman Armstrong agreed to go with Law-

rence to the Markle house. They approached the house together. An outer storm door was unlocked. The main door was ajar about half an inch. Lights were on inside the house. Lawrence could see a black briefcase inside the house, and taped to it was a piece of paper bearing Lawrence's name and address in red ink. Patrolman Armstrong went in and saw Markle's body in an office which was just off the front hallway to the house. Markle had been shot. Patrolman Armstrong radioed for assistance and asked Lawrence to go back to the front porch. Another policeman came quickly, and they carefully began to search the house. They found the bullet-riddled bodies of Markle's wife, Christine, and their young daughters, Amy and Suzanne. The two policemen secured the crime scene and called for detectives.

In conducting the crime scene search the detectives seized items they thought might constitute evidence in a criminal trial. This included guns found inside the house, and the black briefcase. In addition, crime scene and pathologist photographs were taken.

The detectives found a note from Markle stating that he had murdered his wife and daughters and committed suicide. The detectives photocopied the contents of the black briefcase and returned the briefcase and its original contents to Lawrence. Those photocopies are now in the Little Rock Police Department's official files and include copies of:

1. two handwritten letters from Markle to his attorney, appellant Lawrence;

2. a diary containing Markle's notes;

3. a handwritten letter from Markle to his mother, appellant McCambridge; and

4. miscellaneous notes.

Subsequent scientific tests proved that Markle had fired a gun, or guns, just before his death, and that the guns found at the scene were the ones that fired the bullets which killed the victims. The Little Rock Police Department considers the matter a closed case.

Appellants Lawrence and McCambridge filed suit against both the City of Little Rock and the Little Rock Police Depart-

ment seeking to restrain the department from releasing the items listed above and the photographs from the department's official files. Appellant McCambridge, Markle's mother, is an Academy Award winning actress, and as such she is a public figure. The Little Rock Police Department asked the trial court to rule that it did not have to release information gained from informants. The trial court ruled that all of the items mentioned must be disclosed under the Arkansas Freedom of Information Act. We granted a temporary stay which prevented disclosure of any of the items. We dissolve that stay. For clarity, we discuss separately the points of appeal asserted by Lawrence, McCambridge, and the police department.

## II. *LAWRENCE'S POINTS OF APPEAL*

Both of Lawrence's points involve state law only. First, he argues that the police and pathologist photos are not public records under the act. The argument is without merit. As originally enacted, the act applied only to "records made, maintained or kept by any public or governmental body." Act 93 of 1967, Section 3. The definition of "public records" has now been broadened to provide that public records are those "required by law to be kept" or "*otherwise kept and which constitute a record of the performance* or lack of performance of *official functions.* . . ." Ark. Code Ann. § 25-19-103(1) (1987).

Police crime scene photographs and pathologist photographs are obviously "otherwise kept" for evidence in criminal cases as an "official function" of a police department. A citizen could examine crime scene photographs and pathologist photographs and, to some extent, evaluate the performance of a police department. The photos are public records and subject to the act. *City of Fayetteville* v. *Rose*, 294 Ark. 468, 743 S.W.2d 817 (1988).

Second, appellant Lawrence argues that the attorney-client privilege precludes disclosure of the two letters written to him by his client, Markle, and left in the briefcase. This argument is also without merit.

Appellant is attempting to create an exemption to the act other than those listed in Ark. Code Ann. § 25-19-105(b) (Supp. 1987). Twice previously, we have rejected such arguments.

*Laman* v. *McCord*, 245 Ark. 401, 432 S.W.2d 753 (1968); *Scott* v. *Smith*, 292 Ark. 174, 728 S.W.2d 515 (1987).

██ There are two reasons for the rejection of the argument. First, the Freedom of Information Act should be broadly construed in favor of disclosure, and exceptions construed narrowly in order to counterbalance the self-protective instincts of the governmental bureaucracy. Second, the attorney-client privilege, A.R.E. Rule 502, is an evidentiary rule limited to court proceedings. A.R.E. Rule 101. It has no application outside of court proceedings and, therefore, cannot create an exception to a substantive act. *Scott* v. *Smith*, 292 Ark. at 176.

### III. *McCAMBRIDGE'S POINTS OF APPEAL*

McCambridge asserts nine (9) points which in turn contain twenty-eight (28) subpoints based upon both state and federal law. She seeks to prevent release of Markle's two letters to Lawrence, Markle's letter to her, Markle's diary, and the photographs. Many of the subpoints are so wholly without merit that we treat them summarily.

Appellant McCambridge contends that the Arkansas Freedom of Information Act is unconstitutional (a) on its face, and (b) as applied in this case. She contends that the act violates the Constitution of Arkansas, Article 2, Sections 2, 3, 6, 8, 15, 18, 21, 22, and 29. She also contends that the act violates the first, fourth, fifth, ninth and fourteenth amendments to the Constitution of the United States.

Her constitutional arguments can be reduced to five basic assertions. They are: (A) the Arkansas Freedom of Information Act provides for a warrantless search and seizure without probable cause; (B) it provides for a taking of property without due process; (C) it violates the doctrine of equal protection; (D) it unduly chills free speech; and (E) it violated her constitutionally protected right to privacy.

### A.

██ First, McCambridge lacks standing to raise the search and seizure issue, for fourth amendment search and seizure rights are personal and may not be vicariously asserted. *Rakas* v. *Illinois*, 439 U.S. 128 (1978). She had no expectation of

privacy in the place searched, which was not her house, or the things seized, which did not belong to her. Second, the act, on its face, simply does not provide for searches or seizures. Third, the search and seizure did not violate either the federal or state constitutions.

 An emergency or dangerous situation, described in our cases as "exigent circumstances," will justify a warrantless entry into a house for the purpose of either arrest or search. Here, Markle's personal attorney invited the patrolman to accompany him into his client's house because he stated some danger or harm may have come to the family based upon the call from Markle. Once inside, the patrolman found Markle in a pool of blood. It was reasonable for the patrolman to see if the killer was still on the premises, and if the other family members were safe or needed · help. The United States Supreme Court has held:

> [W]hen the police come upon the scene of a homicide they may make a prompt warrantless search of the area to see if there are other victims or if a killer is still on the premises. . . . And the police may seize any evidence that is in plain view during the course of their legitimate emergency activities.

*Mincey* v. *Arizona*, 437 U.S. 385, 392-93 (1978). The briefcase was in plain view and its seizure as evidence was not unlawful. Therefore, the act, as applied, did not amount to an unconstitutional seizure.

## B.

██ The Freedom of Information Act, on its face, does not provide for the taking of property without due process. Further, there is no taking under the act, as applied. A "seizure" of evidence by the police does not constitute a "taking" in the constitutional sense. *Porter* v. *United States*, 473 F.2d 1329, 1337 (5th Cir. 1973). Neither does the release of information pursuant to the Freedom of Information Act. There was no denial of due process in this case.

## C.

██ The Freedom of Information Act provides for ten (10) exemptions from disclosure. Appellant McCambridge complains

about number seven (7) which is for: "Unpublished memoranda, working papers, and correspondence of the Governor, Legislators, Supreme Court Justices, and the Attorney General;" Ark. Code Ann. § 25-19-105(b)(7) (Supp. 1987). She argues that it violates equal protection. No "suspect class" or "fundamental right" is involved in the exception to the act. Hence, the proper test is whether a rational basis exists for the legislation. *Clements v. Fashing*, 457 U.S. 957 (1982). Certainly, there is a rational basis for protecting the working papers of the Governor, the legislators, and the Supreme Court Justices from public disclosure. Such protection promotes and encourages free exchange of thought in each of the three branches of government.

### D.

Appellant McCambridge alleges that the act chills free speech because citizens refuse to give statements to the police for fear that their statements will be made public under the act. However, she has no standing to challenge the act on free speech grounds as she does not assert that her speech has been chilled.

### E.

McCambridge does, however, have a valid privacy argument. The Little Rock Police Department has completed its investigation of the crimes and now considers the case closed. The department is now ready to release the photographs and copies of items which were in the briefcase. Appellant McCambridge contends that the photographs and copies of writings are personal to her and are potentially embarrassing and harmful if disclosed. She argues that their release will violate her constitutional right of privacy.

In *Paul* v. *Davis*, 424 U.S. 693 (1976), the Supreme Court held that the constitutional right to privacy does not prevent disclosure of "a record of an official act such as an arrest." *Id.* at 713. The holding does not extend to information off the public record. *Fadjo* v. *Coon*, 633 F.2d 1172 (5th Cir. 1981). In *Whalen* v. *Roe*, 429 U.S. 589, 598-600 (1977), the Court recognized a right to nondisclosure of personal matters: "Appellees contend that the statute invades a constitutionally protected 'zone of privacy.' The cases sometimes characterized as protecting 'privacy' have in fact involved at least two different kinds of

interests. *One is the individual interest in avoiding disclosure of personal matters*, and another is the interest in independence in making certain kinds of important decisions." (Emphasis supplied.) In a footnote to the above quote the Court cited with approval an article by Professor Philip Kurland which identifies one facet of constitutional privacy as "the right of an individual not to have his private affairs made public by the government." The Court further expressed sensitivity to the need for nondisclosure privacy protection:

> We are not unaware of the threat to privacy implicit in the accumulation of vast amounts of personal information in computerized data banks or other massive government files. The collection of taxes, the distribution of welfare and social security benefits, the supervision of public health, the direction of our Armed Forces, and *the enforcement of the criminal laws all require the orderly preservation of great quantities of information, much of which is personal in character and potentially embarrassing or harmful if disclosed.*

*Id.* at 605 (emphasis supplied).

Since then, the majority of the federal courts have interpreted *Whalen* v. *Roe, id.*, as recognizing a constitutional right to nondisclosure of personal matters. Comment, *A Constitutional Right to Avoid Disclosure of Personal Matter: Perfecting Privacy Analysis in J.P. vs. DeSanti, 653 F.2d 1080 (6th Cir. 1981)*, 71 Geo. L.J. 219 (1981).

In *Nixon* v. *Administrator of Gen. Serv.*, 433 U.S. 425, 455 (1977), the Court expressly discussed the topic under the heading "Privacy," and said even the President of the United States was entitled to at least a limited right of privacy:

> One element of privacy has been characterized as "the individual interest in avoiding disclosure of personal matters. . . ." *Whalen* v. *Roe*, 429 U.S. 589, 599 (1977). We may agree with appellant that, at least when Government intervention is at stake, public officials, including the President, are not wholly without constitutionally protected privacy rights in matters of personal life unrelated to any acts done by them in their public capacity.

*Id.* at 457.

In *Paul* v. *Davis*, 424 U.S. 693, 713 (1976), the Court expressly stated that fundamental privacy interests include family relationships. In addition, the right to nondisclosure by the government is "independent of the question of ownership of the materials. . . ." *Nixon* v. *Administrator of Gen. Serv.*, 433 U.S. at 458. In summary, appellant McCambridge has a right to avoid disclosure by the government of some personal matters.

The obvious next question is, do the items at issue in the instant case involve personal matters? In that part of *Whalen* v. *Roe*, quoted previously, the Court indicated that a personal matter was a matter "personal in character and potentially embarrassing or harmful if disclosed." Falby, in his *Georgetown Law Journal* comment, writes that a "personal matter" ought to be information: (1) that the individual wants to and has kept private or confidential, (2) that, except for the challenged government action, can be kept private or confidential, and (3) that to a reasonable person would be harmful or embarrassing if disclosed. 71 Geo. L.J. at 240. Falby's test for determining "personal matters" is a fair standard. The first part of the test encompasses information the individual wants to keep and has kept private. One should not expect to keep private information he has indiscriminately exposed in public. The items in the case at bar satisfy this part of the test as appellant McCambridge has not disclosed anything, and, in fact, has filed this lawsuit to prevent disclosure.

The second part of the test excludes matter which is already on the public record. The items at issue here were not already a part of the public record.

The third part of the test involves an objective test, whether the matter would be highly offensive to a reasonable person. This third part of the test is satisfied with respect to: (1) the two letters from Markle to his attorney; (2) the diary containing Markle's notes; (3) the letter from Markle to his mother; and (4) the photographs. The reasons therefore will be apparent in the discussion of balancing of interests below. Accordingly, we hold that those items are personal matters. The third part of the test, however, is not met with respect to the six pages of miscellaneous notes written by Markle. We can summa-

rily say that appellant has no privacy interests in them as they cause her no harm or embarrassment.

Having determined the items that involve personal matters, the final question is whether the governmental interest in disclosure under the Freedom of Information Act outweighs the appellant's privacy interest in the nondisclosure of the personal matters. *Nixon v. Administrator of Gen. Serv.*, 433 U.S. 425, 458 (1977).

The strength of appellant McCambridge's individual privacy interest in nondisclosure varies among the items. The police crime scene photographs and pathologist photographs are horrible and sickening, as are all such multiple murder photographs. Appellant will naturally be sensitive to the pictures, but balanced against the appellant's interest in preventing dissemination of the photographs are the government's strong interests in depicting how the multiple murders occurred, why the police consider the case closed as a triple murder-suicide matter, and why no further action should be taken. This is a highly valued governmental interest. Accordingly, we hold that the photographs should be released under the Freedom of Information Act.

Similarly, appellant will be sensitive to the matters revealed in her son's diary because the diary reflects Markle's serious financial troubles, possible criminal charges against him, and his thoughts of suicide. However, these are probative and relevant to the nature and course of the crime. Again, this is a highly valued governmental interest, and it outweighs McCambridge's interest in nondisclosure.

In the briefcase, Markle left two letters to his lawyer, appellant Lawrence. Again, McCambridge's sensitivity to some of the information contained in these letters is understandable, but the State's interest in disclosure is very strong. The first paragraph of the first letter is a "Review of Conversation" of the telephone call to Lawrence at four o'clock on the morning of November 16. It states, "I murdered my wife, and 2 children and committed suicide." Further, the letters direct Lawrence about how to close Markle's personal and business affairs. The information confirms the conclusions reached by the police. The public has a strong interest in the announced solutions to crimes.

The last item in the briefcase is the letter from Markle to appellant McCambridge. The letter is from an angry son to his mother. For the most part it deals with their lives and relationships and is most sensitive. While public figures cannot expect the same degree of privacy as private citizens, they can reasonably expect privacy in personal letters to or from their children. Even the President of the United States has a privacy interest. Accordingly, McCambridge's interest in nondisclosure of this letter is very high.

However, the letter also discloses Markle had traded McCambridge's stock market account on a discretionary basis and apparently did the same for Stephens, Inc., an investment banking company. In the letter Markle admits, "I added funds to your account; I added losses to the Stephens' account." The letter does not disclose the exact amount Markle shorted Stephens, but the figures given indicate it was well over a million dollars. It reveals that he had been caught "so now I and my whole family are dead — so you can have the money. . . ." The information bears on the suicide-murders and is relevant in determining a solution to the homicides. The public has a very strong interest in announced solutions to crime, and, here, the public's interest outweighs McCambridge's privacy interest.

Aside from her five constitutional arguments, appellant McCambridge asks us to construe the act under state law in such a way that police records are exempt from disclosure. We summarily reject the request because the appellant does not present a convincing argument nor authority, and the merits of the argument are not readily apparent. *Dixon v. State*, 260 Ark. 857, 545 S.W.2d 606 (1977).

## IV. *LITTLE ROCK POLICE DEPARTMENT'S POINTS OF APPEAL*

The Arkansas Freedom of Information Act contains a "law enforcement" exemption. Ark. Code Ann. § 25-19-105(b)(6) provides that "undisclosed investigations by law enforcement agencies of suspected criminal activity" are not subject to public inspection. See J.Watkins, *The Arkansas Freedom of Information Act* 67 (1988) for discussion.

The police file in this case included statements from confi-

dential informants. The department does not want to release those statements and argues that such disclosure will detract from effective law enforcement to such a degree that it will operate in derogation, and not in support, of the public interest. Included among the reasons for providing this exemption by interpretation are the prevention of the disclosure of confidential investigative techniques, procedures, or sources of information, the encouragement of individual citizens to come forward and speak freely with police concerning matters under investigation, and the creation of initiative so that police officers might be completely candid in recording their observations, hypotheses, and interim conclusions. The argument could be well addressed to the General Assembly. We can only interpret the exemption as it is written.

The only purpose of the exemption, as written, is to prevent interference with ongoing investigations. When a case is closed by administrative action, as this one was, the reason for the exemption no longer exists, and the trial court correctly ordered the statements released. Accordingly, we affirm the ruling of the trial court that the police reports are to be released.

HICKMAN, HAYS, and NEWBERN, JJ., concur.

PURTLE and GLAZE, JJ., concur in part and dissent in part.

DARRELL HICKMAN, Justice, concurring. I agree with the result reached by the majority, but I write to emphasize two things.

First, I don't find the "letter" to Ms. McCambridge to be a document in which she has any constitutionally protected interest, whatever this right to privacy may be. The letter undoubtedly aided the police in determining the fact that Markle murdered his family and then killed himself. It also shed light on his motive for doing so. While the letter was addressed to Markle's mother, it was not delivered. She has never seen it. It was found at the scene of the crime. It was legitimate evidence, lawfully gained and properly used in the investigation of a crime. It was not, therefore, a purely personal document entitled to any privacy that the constitution may grant. *See Nixon* v. *Administrator of General Services*, 433 U.S. 425 (1977), where the Court spoke of personal letters "unrelated to any acts done . . . in [a] public capacity."

That means that under Arkansas law, the document is subject to public examination. *City of Fayetteville* v. *Rose*, 294 Ark. 468, 743 S.W.2d 817 (1988). When Markle killed his family and then himself, he made his actions a public matter; he opened the door to an investigation of what happened and why. With that comes the right to examine all the available evidence relative to his motive and actions. The police copied all the documents in the briefcase and have those copies in their official files. The officers testified they found these documents relevant to the crime. Under Arkansas law, they are public documents.

Second, the City of Little Rock wants us to rewrite the Freedom of Information Act. It clearly states that all public records of law enforcement agencies shall be available for inspection except for those contained in "undisclosed" investigations of suspected criminal activity.

The word "undisclosed" is not vague or hard to interpret — it is just not the word the city wants. *See City of Fayetteville* v. *Rose, supra.* The city and law enforcement officials should take up this question with the legislature.

DAVID NEWBERN, Justice, concurring. I join the majority opinion but wish to write separately to state my views on the right of privacy.

There is no doubt that the document in question here, the letter from Mr. Markle to Ms. McCambridge, is being maintained in a public office and is presumed to be a public record. Ark. Code Ann. § 25-19-103 (1987). Thus, it is open to inspection and copying, Ark. Code Ann. § 25-19-105 (1987), unless it falls within a statutory exception or disclosure of it would violate a constitutional right. None of the exceptions of Ark. Code Ann. § 25-19-105 (1987) applies, so the only question is the constitutional one.

The majority opinion is correct in stating that the United States Supreme Court recognized the right to non-disclosure by government of private matters in *Whalen* v. *Roe*, 429 U.S. 589 (1977). It is also correct in pointing out that it was again recognized in *Nixon* v. *Administrator of General Services*, 433 U.S. 425 (1977). However, the recognition came as *obiter dicta* in those cases. The *Whalen* case held that New York's laws

safeguarding the release of drug treatment information contained in state computer information banks were sufficient to protect whatever privacy interest patients may have had in the information. In stating that which the court did not decide, Mr. Justice Stevens wrote: "We therefore need not, and do not, decide any question which might be presented by the unwarranted disclosure of accumulated private data—whether intentional or unintentional—or by a system that did not contain comparable security provisions." 429 U.S. at 605-607. To me it is clear the Supreme Court would have protected the information at stake had it not been for the safeguards. The only basis for the protection would have been the privacy right not to have the information disclosed. The court was hardly disavowing the privacy right by making that statement. The *Nixon* case held the former president's privacy interest would not preclude a limited invasion for the purpose of separating personal from public materials.

Neither of the cited cases, when limited to its holding, can stand for the proposition that there is a right of privacy requiring the government not to disclose sensitive, personal, private, information. Realizing that there is no holding supportive of the right of privacy where it was asserted to prevent governmental disclosure of personal information, we could refuse to recognize it, knowing full well that the right is there. We should, however, do as the majority opinion has done and ascertain the law on the basis of our prediction as to how the United States Supreme Court would determine this issue.

*Griswold* v. *Connecticut*, 381 U.S. 479 (1965), is typical of the cases recognizing the right of privacy citizens have in making decisions with respect to their intimate personal conduct. That statement of constitutional protection of the privacy right is clear. In *Stanley* v. *Georgia*, 394 U.S. 557 (1969), it was held that the power of a state to regulate pornography did not extend to condemning possession of it in one's home. The court quoted with approval Mr. Justice Brandeis's dissenting opinion in *Olmstead* v. *United States*, 277 U.S. 438 (1928), in which he wrote that the authors of the Constitution "conferred, as against the Government, the right to be let alone—the most comprehensive of rights and the right most valued by civilized man. [227 U.S. at 478]." What a citizen chooses to think or to expose himself or herself to is

also protected. The right of privacy thus was held to extend beyond the personal conduct to which it applied in the *Griswold* case.

Here we are not balancing the right of the state to regulate a perceived evil against the right of privacy. Rather, we are balancing the right of the citizens to information which reveals the nature and operation of government against the right of a citizen not to have intimate personal matters disclosed. If that right did not exist, the Supreme Court would have simply said so in the *Whalen* and *Nixon* cases and would not have scrutinized the schemes designed to protect it. Instead, the court wrestled the right of government to have the information in question against the right of the citizen not to disclose it to the government, and the ultimate discussion was about whether the government procedures would protect sufficiently the right of the citizen not to have the information disclosed publicly. Neither case held the right existed, but both of them found it necessary to discuss it, and I find that to be a clear recognition of it.

The right to be let alone must, of course, yield to the police power when overbalanced by it. It should, likewise, yield to the interest and right of the citizenry to know and understand how their government is being conducted when overbalanced by that right. If the letter from John Markle to his mother had contained nothing relevant to the four homicides, I believe this court would protect Ms. McCambridge's privacy right and not allow it to be disclosed. While the document is subject to the provisions of the Arkansas Freedom of Information Act, sections of which were cited at the outset of this opinion, the governmental interest protected by that act must be balanced against Ms. McCambridge's constitutional right to privacy. We have engaged in the same sort of balancing conducted by the Supreme Court in the *Whalen* and *Nixon* cases and concluded the public's right to know must prevail.

HAYS, J., joins this opinion.

JOHN I. PURTLE, Justice, concurring in part and dissenting in part. The circumstances of this case have convinced me that the letter from the deceased to his mother and the letters and other material specifically addressed to the attorney should be treated as though they had been delivered. The right of an individual not

to have his personal and private affairs made public by the government unquestionably protects the privacy of these highly personal papers. It is my opinion that the "zone of privacy" is broad enough to cover a communication with one's attorney and a letter to one's mother.

Clearly the material in the briefcase was not a public record prior to being seized by the government. It was never intended to be a part of the public domain. The mere fact that the police may have had the right to look at these papers in the course of their investigation did not, by some process of governmental alchemy, transform this personal and private material into public property. The majority, by judicial fiat, wrongly converts the character of the briefcase contents and the final letter to Mr. Markle's mother from the property of the mother and the attorney to the property of the police department. Although the police had the right to examine everything they discovered at the scene of the crime, they did not, in consequence, automatically have the right to keep everything they examined and make those items a matter of public record. The rationale behind the procedure endorsed today by the majority would, if carried to its logical conclusion, render the utmost secrets of a victim the property of the police department, and thus subject these secrets to public scrutiny and commercial exploitation.

The majority derives strength from the fact that personal and confidential letters and papers are not expressly exempted from disclosure under the Freedom of Information Act. The most compelling reason for not expressly excluding such information from the mandate of the F.O.I.A. is that the concept is so basic that it was not thought that anyone would claim such material was not privileged. There is no legitimate state purpose in releasing such material to the public.

To read the statute so broadly is not in keeping with the intent of the act. The majority's interpretation would appear to allow the police to confiscate everything on the scene, including books, papers, articles, pictures, and other secret and personal effects, thereby making them available for public inspection. At the very least, I believe the majority should have exempted the letter from Markle to his mother from disclosure under the provisions of the Freedom of Information Act. The "zone of

privacy" exception is also broad enough to include the material in the briefcase which was intended only for the deceased's attorney. Every bit of information in this record indicates that John Markle fully expected privacy in these circumstances. When we allow personal and confidential letters to enter the public record after seizure by the authorities, we have taken a step toward becoming a police state. "The makers of our Constitution," as Justice Brandeis observed in his dissent in *Olmstead* v. *United States*, 277 U.S. 438 (1928), ". . . conferred, as against the Government, the right to be let alone — the most comprehensive of rights and the right most valued by civilized men."

My strongest objection to the majority decision concerns the release of the photographs of the victims of this tragedy. If these gruesome photographs ever served any purpose, that purpose has long since been accomplished. The photographs should then become, like witnesses, no longer a part of the record. There can be no legitimate expectation on the part of the media or the public to examine the horrendous and sickening photographs of every homicide case. All that need be said publicly about these photographs and this material is contained in the majority and concurring opinions.

The majority quotes from *Whalen* v. *Roe*, 429 U.S. 589 (1977), which holds that even public officials have a constitutionally protected privacy right in matters of their personal life unrelated to their function in their public capacity. An individual citizen certainly has a greater expectation of privacy and should be protected from governmental disclosure of purely personal matters. I do not understand how it can be asserted that the letter and the attempted communication with the attorney are not "personal in character and potentially embarrassing or harmful if disclosed."

It is obvious that: (1) the deceased wanted to keep these matters confidential; (2) except for the government action, the material would have been kept confidential; and (3) the contents would be harmful or embarrassing to relatives and friends if they were disclosed. This material consequently meets the privacy test as stated in *Whalen* v. *Roe*, *supra*. Death has sealed the lips of John Markle and his wife and children. The media should not now be given license to expose every facet of his personal life and that

of his family. Hopefully, those now entrusted with public disclosure of these materials will use common sense and respect the dignity of the surviving members of the family. The matter is in their hands.

There is of necessity a balancing of interests in this case. The items under consideration are obviously matters of a deeply personal nature which would never have been disclosed had it not been for their seizure by the state. The right of the public to know must be balanced against the right of the individual to privacy, even in cases of great notoriety. See *Department of the Air Force v. Rose*, 425 U.S. 352 (1976). The photographs add nothing to the government's explanation of the murders and suicide. There is no doubt about what happened, and the pictures and personal letters and instructions add not one scintilla to the strength of the state's conclusions. Nothing about the photographs would remotely assist the members of the public in evaluating the duties of the police department.[1]

For the very reasons set out in the majority opinion, I would hold the personal diary to be protected by the constitutional right of privacy. The diary may have some remote relevance to the other materials to be released under the majority opinion, but it does not in any way aid in the solution of the crime. Nor does release of the diary enhance any legitimate expectation of commercial enterprises to delve into the gory details of this sad event.

In my opinion, neither the deceased's letter to his mother nor the contents of the briefcase intended for his lawyer are items covered by the Freedom of Information Act. Moreover, common decency and respect for the dead and the living surely demand that this material not be commercialized. I read the material and looked at some of the photographs only because it was my duty to

---

[1] It may be worth noting that the federal Department of Energy, in dealing with an FOIA request, under 5 U.S.C. 552(b)(6), 10 C.F.R. 1004-10(b)(6), for the release of grisly photographs of the bodies of three persons killed in a reactor explosion, held that while disclosure would not invade the privacy of the deceased victims, the privacy protection of exemption 6 of the act extends to the individual's immediate family. Thus, "release of the photographs would constitute a substantial invasion of the privacy of the victims' families." *Independent Documentary Group, San Francisco, California*, 7 DOE 80, 174 (1981). See also *KUTV, Inc.*, 4 DOE 81, 150 (1979).

do so. Having done so, I am absolutely persuaded that there is no valid reason to reveal this information to the public. Even if there should be any such reason, its validity is far outweighed by the reasonable expectation of privacy existing at the time the writings were committed to paper. So far as I am concerned, there is no right to exhibit gruesome photographs of dead people.

TOM GLAZE, Justice, concurring in part and dissenting in part. I depart from the majority in its holding that Ms. McCambridge has a valid privacy argument. The majority relies largely on the Supreme Court's decision of *Whalen v. Roe*, 429 U.S. 589 (1977), when concluding McCambridge has a right to avoid disclosure by the government of a personal letter left her by her son. In my view, the court's reliance is misplaced.

In this case, police officers obtained the Markle letter, which was directed to his mother as a result of a criminal investigation. The Little Rock Police Department later closed its investigation, finding that Markle killed his family and then committed suicide. At that point, the information gathered by the police became subject to disclosure under the Arkansas Freedom of Information Act (FOI Act), as we recently interpreted that Act in *City of Fayetteville v. Rose*, 294 Ark. 468, 743 S.W.2d 817 (1988). Although the majority suggests that, irrespective of the FOI Act, the disclosure of a personal letter from Markle to McCambridge is subject to the privacy right of McCambridge, I submit that the court in *Whalen* never intended to extend such a right to this type of fact situation.

Here, police officers conducted a proper fourth amendment search and seizure of the Markle residence, and as a result, they acquired Markle's letter along with the other items and evidence found at the crime scene. Thus, we have no one's privacy and security being arbitrarily invaded in violation of the fourth amendment. While we do not have the same concern that the court addressed in *Katz v. United States*, 389 U.S. 347 (1967), the court there did make it clear that the right of privacy under the fourth amendment cannot be translated into a general constitutional "right of privacy." On this point, the majority court and the parties in this cause have failed to cite any cases that involve a privacy right to avoid disclosure of personal matters which the government acquired as a result of a criminal investiga-

tion. By the same token I am aware of none.

From my reading of the cases in this area, and I would be the first to admit that they are far from clear, I find no indication that the right of privacy applies to the disclosure of information obtained through a valid search and seizure. In my view, state law controls the disclosure issue before us, not the constitutionally protected right of privacy. McCambridge simply has no privacy right in this cause. The sole issue, in my judgment, is whether the Markle letter is subject to disclosure under the FOI Act, and considering this court's recent decision in *Rose*, I have no doubt that it is.