The Honorable David Johnson State Senator
2511 Valley Park Drive Little Rock, Arkansas 72201
Dear Senator Johnson:
I am writing in response to your request for my opinion on the following questions:
 1. Under applicable law, may the University of Arkansas, a public institution, require a person to make a monetary or other donation to a nonprofit corporation such as the Razorback Foundation in order to purchase a ticket to a University of Arkansas athletic event?
 2. If the University of Arkansas may require such donations to a nonprofit corporation such as the Razorback Foundation, do such donations open the foundation's records under Arkansas's Freedom of Information Act?
I should note by way of background that your questions appear to assume that the University of Arkansas (the "University") indeed conditions the purchase of any ticket to a University athletic event upon the purchaser's making a contribution to the Razorback Foundation (the "Foundation"). It is my understanding that the University imposes no such blanket requirement. The University is, however, apparently party to a contractual agreement with the Foundation whereby the University reserves the majority of the seats in its stadiums for patrons who have pledged certain amounts in contributions to the Foundation.[1] In consideration of *Page 2 
the University's reserving these seats, the Foundation has pledged to pay the University in excess of $4 million dollars annually. The direct price of a ticket for attending any game is reportedly the same for any attendee, regardless of whether the attendee is or is not a contributor to the Foundation.
RESPONSE
Both of your questions assume that the University of Arkansas conditions the purchase of any ticket upon making a donation to the Razorback Foundation — a premise that appears to be incorrect. Although the University does reserve certain seats for Foundation donors, other seats are reportedly available for non-donor attendance. The Foundation reportedly pays millions of dollars annually for this privilege. With respect to your first question, so long as this contract is supported by adequate consideration and the proceeds are devoted to serving a public purpose consistent with the University's educational mission, I see nothing objectionable in the preferential-seating arrangement. With respect to your second question, although the issue is ultimately one of fact, it would appear that the Foundation is not the direct recipient of public funds. Accordingly, I do not believe the contractual arrangement that affords Foundation sponsors preferential seating would open the Foundation's records to inspection under the FOIA.
Question 1: Under applicable law, may the University of Arkansas,a public institution, require a person to make a monetary or otherdonation to a nonprofit corporation such as the Razorback Foundation inorder to purchase a ticket to a University of Arkansas athleticevent?
As noted above in my statement of the background facts, it does not appear that the University imposes any blanket requirement that a patron contribute to the Foundation in order to buy a ticket to an athletic event. It does appear to be the case, however, that the University, in consideration of the monetary payment recited above, accords preferential seating to individuals who have contributed to the Foundation.
The factual scenario just recited raises issues of contract law that do not directly implicate the notion of "donations." At issue, it seems to me, is only whether, as a matter of contract law, the University might be warranted in qualifiedly reserving certain seats for individual contributors to the Foundation in exchange for the Foundation's making a significant payment to the University. This question ultimately boils down to the factual issue of whether the monetary payment made *Page 3 
to the University is adequate under the circumstances and will serve the University's public educational mission. With respect to the latter consideration, Article 14, § 2 of the Constitution provides:
 No money or property belonging to the public school fund, or to this State, for the benefit of schools or universities, shall ever be used for any other than for the respective purposes to which it belongs.[2]
Complementing this constitutional provision is what is known as the "public purpose doctrine," which, as the Arkansas Supreme Court has articulated, derives both from common law and the due-process clause of the constitution:
 No principle of constitutional law is more fundamental or more firmly established than the rule that the State cannot, within the limits of due process, appropriate public funds to a private purpose.[3]
This office has further repeatedly defined the term "public purpose" as denoting a purpose that involves the welfare of the community and directly benefits the public.[4]
Under the circumstances you have recited, it is difficult to envision how the University's contractual agreement with the Foundation involves any expenditure *Page 4 
of public funds to benefit a private entity. Indeed, pursuant to the agreement, the University conveys no public funds whatsoever to the Foundation. Rather, the University realizes millions of dollars per year in addition to ticket revenues by providing Foundation contributors preferential seating. This conclusion in itself should end the inquiry whether there has been a diversion of public funds to a private entity in derogation of the public purpose doctrine. The only remaining questions, then, would appear to be whether the consideration the University receives is adequate payment for the priority seating and whether the contract might reasonably be described as designed to serve advance the University's educational mission.[5]
With respect to the first of these questions, I am not a finder of fact and therefore cannot speculate whether the consideration paid by the Foundation for the University's allowing Foundation patrons preferential seating might be described as adequate. Only a court acquainted with all of the pertinent facts could make this determination.
With respect to the second question, in the present case, there appear to be two issues that do not directly involve the expenditure of public funds — first, whether the contract at issue might in fact be characterized as serving a public purpose in the sense defined in this office's previous opinions and, secondly, if so, whether that purpose might be characterized as congruent with the University's educational mission. Assuming the adequacy of the consideration paid by the Foundation, and further assuming that the University indeed devotes that consideration to fulfilling *Page 5 
its educational mission, I believe the answer to both of these questions would be "yes."
Finally, implicit in your question appears to be some concern that the University's policy of preferentially assigning seating might be characterized as unfair to those sports fans who elect, for whatever reason, not to contribute to the Foundation. In constitutional terms, this concern raises questions of equal protection.[6] The equal protection doctrine prohibits certain types of "classifications" that result in the disparate treatment of those who are similarly situated. However, classifications in and of themselves do not violate the equal protection doctrine. In order to establish an equal protection violation arising out of a classification that does not affect a suspect class or a fundamental right, as is the case in this instance, it is necessary to show that the disparity is arbitrary — that is, that the disparity has no conceivable rational basis or rational relation to a legitimate end.[7] In reviewing the constitutionality of a classification that does not affect a suspect class or a fundamental right, the courts must not only presume the constitutionality of the challenged classification, but they must also uphold the classification even without requiring a showing of an actual rational basis, so long as any conceivable rational basis for the scheme can be adduced — even a hypothetical one.[8]
The pertinent classifications in this instance appear to be, on the one hand, those individuals who obtain access to preferential seating based upon their contributions to the Foundation and, on the other, those individuals who are denied preferential seating because of their failure to contribute to the Foundation. The question, then, is whether any conceivable rational basis exists for the University to base its seating assignments upon whether an individual has contributed to the Foundation. *Page 6 
In my opinion, a court would almost certainly conclude that drawing this distinction does pass the rational-basis test. It may be that the University, based purely upon financial considerations, determined that earning millions of dollars over and above ticket revenues warranted providing a preference to Foundation donors. The University may well have concluded that this added revenue would more than exceed the additional revenues the University might realize by raising ticket prices to a sustainable level across the board. The University may further have concluded that raising ticket prices in any significant amount would prove disheartening to the Razorback fans. In addition, the University may have concluded that accommodating the Foundation — assuming an arm's-length contract might indeed be classified as an "accommodation" — was worthwhile given that the Foundation apparently exists solely to advance the salutary goal of promoting the University's athletic programs. Accordingly, I do not believe that the distinction at issue raises any sustainable equal protection concerns.
Question 2: If the University of Arkansas may require suchdonations to a nonprofit corporation such as the Razorback Foundation,do such donations open the foundation's records under Arkansas's Freedomof Information Act?
Again, I must note that your characterization that the University "may require such donations" as a condition of buying a ticket is mistaken, given that it is possible to purchase a Razorback ticket without contributing to the Foundation.
As regards the circumstances that might subject the Foundation to a disclosure requirement under the Arkansas Freedom of Information Act, [9] the initial and, quite possibly, conclusive, inquiry must be whether the private organization at issue — in this case, the Foundation — is wholly or partially supported by public funds as contemplated by the FOIA.
While the FOIA does not define "public funds," the Arkansas Supreme Court has defined the term to mean the following: "[m]oneys belonging to government, or any department of it, in hands of public officials."[10] An entity does not satisfy this *Page 7 
element merely because it receives an indirect benefit from the government such as a reduced rate for leasing land.[11]
Assuming the factual recitation set forth above is correct — an assumption I will accept for purposes of this discussion but that I am unable to test — it would appear that the Foundation receives no direct "public funds" from the University as that term is used in connection with the FOIA. Rather, the Foundation receives private funds in the form of donations from Razorback fans, possibly using part of these funds to provide the consideration for the contract under which the University offers preferred seating to the Foundation's donors. The University provides the Foundation at most an indirect benefit in the form of preferred seating — a benefit that is indirect precisely because it involves no expenditure of public funds. Indeed, the University actually adds to its "public funds" inasmuch as it receives significant cash, in addition to its uniform ticket receipts, in consideration of its providing the Foundation with preferred seating.
I appreciate that an opponent of the preferential-seating scheme might argue that a patron's "donation" to the Foundation is in fact part of the price of a preferred seat, given that making the donation is a condition of having access to the seat. Under this reasoning, one might argue that the donation is a de facto part of the ticket price and hence should be considered "public funds" that have been diverted to the Foundation, even though never having actually been in the possession of the University. However, this reading frankly strikes me as strained in light of the fact that the University never expends any public funds in connection with the preferential-seating arrangement, instead receiving substantial funds in consideration of entering into the arrangement.[12] Simply put, I do not believe any *Page 8 
indirect benefit accruing to the Foundation might be characterized as a direct payment of public funds under the rule set forth inWeatherford.[13] Under these circumstances, then, I do not believe the FOIA would mandate providing access to the Foundation's books.
Assistant Attorney General Jack Druff prepared the foregoing opinion, which I hereby approve.
Sincerely,
DUSTIN McDANIEL Attorney General
[1] This reservation is apparently qualified to the extent that the University may sell a ticket to a non-contributor to the Foundation in the event that the reserved seat is unoccupied on any given occasion.
[2] Article 16, § 13 of the Arkansas Constitution further provides:
 Any citizen of any county, city or town may institute suit, in behalf of himself and all others interested, to protect the inhabitants thereof against enforcement of any illegal exactions whatever.
The Arkansas Supreme Court has repeatedly held that this provision applies to a misapplication of state funds as well as of funds of a political subdivision. See, e.g., Taylor, Cleveland Co. v. PineBluff, 34 Ark. 603 (1879); Farrell v. Oliver,146 Ark. 599, 229 S.W. 529 (1921); Jones v. Capers,231 Ark. 870, 333 S.W.2d 242 (1960); Arkansas Ass'n of Judges v.Green, 232 Ark. 438, 338 S.W.2d 672 (1960); Starnes v. Sadler,237 Ark. 325, 372 S.W.2d 585 (1963). However, the misapplication of public funds must be of funds generated by tax revenues, see Austin v.Center Point Energy Arkla,365 Ark. 138, 147, 226 S.W.3d 814 (2006) ("In order for Austin to have a valid illegal-exaction claim, there must necessarily be a tax.") — a condition that does not appear to have been met in this case.
[3] Chandler v. Board of Trustees of the Teacher RetirementSystem, 236 Ark. 256, 258, 356 S.W.2d 447 (1963). The due-process clause is set forth at Ark. Const. art. 2, § 8.
[4] See, e.g., Ops. Att'y Gen. Nos. 2009-193; 2005-248; 2004-311; and 2004-269.
[5] I appreciate that the Foundation benefits from the contract insofar as its patrons are afforded privileged seating. However, a so-called "incidental private benefit" will not automatically invalidate an expenditure of public funds. See Ark. Op. Att'y Gen. 2004-319 (stating that "[a]n authorized use for a public purpose is not, however, invalid even though it involves an incidental private benefit," quoting Ark. Op. Att'y Gen. No. 1993-343 and citing 64 C.J.S. Municipal Corporations § 1725 (1950). See also Ark. Op. Att'y Gen. 2000-243 (citing League of Women Voters of California v.Countywide Criminal Justice Coordination Committee,203 Cal.App.3d 529, 554 (1988) ("So long as a public interest is served, there is no unlawful expenditure of public funds even though there may be incidental benefits to private persons.")). The question is whether the expenditure is for a "primarily public purpose" or "directly benefit[s] those who were taxed to pay for the expenditure." Op. Att'y Gen. 2005-102 (citing Op. 2004-319 and Chandler, supra.) Moreover, the incidental-benefit analysis is in all likelihood beside the point in light of the fact that the relationship between the University and the Foundation is contractual, meaning that consideration in the form of benefits flows both ways. The authority of the University Board of Trustees to enter into such a contract arises from A.C.A. § 6-6-4-202 (Repl. 2003), which invests the Board with "all the powers of a corporate body," including the power to enter into contracts in pursuit of the University's mission. The issue consequently is not one of a gratuitous conveyance of tax revenues that benefits a private entity.
[6] The equal protection doctrine is set forth both in theFourteenth Amendment to the United States Constitution and in article 2, §§ 2 and 3 of the Arkansas Constitution.
[7] Vacco v. Quill, 521 U.S. 793 (1997); Romer v. Evans,517 U.S. 620, 631 (1996); Clements v. Fashing, 457 U.S. 957 (1982);Craft v. City of Fort Smith, 335 Ark. 417, 984 S.W.2d 22 (1998);Medlock v. Leathers, 311 Ark. 175, 842 S.W.2d 428 (1992), reh. denied, 1993; McCambridge v. City of Little Rock,298 Ark. 219, 766 S.W.2d 909 (1989); Streight v. Ragland,280 Ark. 206, 655 S.W.2d 459 (1983); City of Piggott v. Woodard,261 Ark. 406, 549 S.W.2d 278 (1977).
[8] Ester v. National Home Ctrs., Inc.,335 Ark. 356, 981 S.W.2d 91 (1998); Reed v. Glover,319 Ark. 16, 889 S.W.2d 729 (1994); Arkansas Hospital Assoc. v. StateBoard of Pharmacy, 297 Ark. 454, 763 S.W.2d 73 (1989).
[9] A.C.A. §§ 25-19-101 through-110 (Repl. 2002 Supp. 2009).
[10] Sebastian County Chapter of American Red Cross v.Weatherford, 311 Ark. 656, 659, 846 S.W.2d 641, 644 (1993) (citing Black's Law Dictionary 6th ed. (1990)).
[11] Weatherford, supra note 11. In Weatherford, a local Red Cross chapter entered into a lease agreement that permitted the chapter to lease certain municipal land for 30 years at $1 per year. All parties stipulated, and the circuit court found, that the property's fair-market rental-value was greater than $1 per year. Consequently, the circuit court held that the chapter was partially supported by public funds. The Arkansas Supreme Court disagreed, holding that the lease agreement was an indirect benefit, and that only the receipt of direct public funding could trigger the application of the FOIA.Id. at 660-61. See also Watkins Peltz,supra at § 203[e].
Moreover, a private entity that receives only partial support from government is only partially bound by FOIA requirements. Ops. Att'y Gen. Nos. 2010-081 and 2007-227. That is, in some situations, a private entity may be subject to the FOIA only to the extent of requiring the openness of meetings and records that are "relevant to the task" of the public business that is carried out by the entity. Edmark,supra at 186-87; Watkins Peltz, supra at § 2.03.
[12] I am only reinforced in this conclusion by the fact that the federal government allows the private donors to claim a tax exemption for their donations to the Foundation. See
I.R.C. § 170(l).
[13] See n. 12, supra.