FISER *v.* CLAYTON, STATE TREASURER AND CLAYTON, STATE TREASURER *v.* McAMIS.

4-9718 and 4-9829                    254 S. W. 2d 315

Opinion delivered January 26, 1953.

*Sol J. Russell,* for appellant.

*Wright, Harrison, Lindsey & Upton, E. R. Parham* and *Bailey & Warren; Ike Murry,* Attorney General; *Cleveland Holland* and *W. R. Thrasher,* Assistant Attorneys General, for appellee.

*Pickens & Pickens,* for certain appellants in Case No. 9829.

530

GRIFFIN SMITH, Chief Justice. The two cases—one instituted by A. J. McAmis and the other by Tom Fiser—involve the same primary factor: that is, Does Act 214 of 1943 (which by § 4 denounces violation as a felony) prohibit a state officer, agent, employe, or any employe of a state agency, from rendering compensable services or selling goods, wares, or merchandise to a department of the state where, in respect of such purchasing department or agency the seller has no interest or connection other than that which might be implied from the fact of membership upon the board or commission that is *not* the purchaser?

Stated differently, Was it the legislative intent to circumscribe the conduct of every board and commission member to such an extent that no relationship whatever involving possibility of profit to such non-purchasing member or to any corporation, partnership, or association in which he was interested, might accrue?

An example would be this: A is a member of the board of trustees of B. college and owns a share of stock in an insurance corporation. The University of Arkansas, for wholly practicable purposes and admittedly, in a particular case, where convenience is best served and rates of all companies are identical, purchases a policy of insurance covering University property. A does not know that the transaction has occurred and through exercise of reasonable diligence would not have been informed. His only financial advantage comes through dividends normally payable by the insurance company. Query: Has A committed a felony?

The McAmis complaint first identifies Vance Clayton as treasurer of state, J. Oscar Humphrey as auditor, Lee Roy Beasley as comptroller, Dean R. Morley as commissioner of revenues, and Carl Parker as state purchasing agent. It is conceded that at the time the questioned transactions occurred Truman Baker was a member of the state highway commission, Doyne Hunnicutt was an officer of the state police commission, J. T. McCool was a trustee of Arkansas A. & M. College, and

that Baker, Hunnicutt, and McCool had sold merchandise or rendered compensable services to an agency of the state other than the board or commission of which he was a member.

Baker is owner of a Chevrolet agency managed by Hunnicutt. Through Hunnicutt's activities motor supplies, equipment and materials were sold to state departments. An inventory showing substantial dealings by Hunnicutt and Baker upon the one hand and the state police department upon the other is attached as an exhibit and the sales are not denied.

McCool, as agent for Remington Rand, Inc., was instrumental in selling the department of revenues a variety of supplies, including the equipment and materials required to put into operation the Certificates of Title Act relating to automobile ownership.

The Fiser complaint names State Treasurer Clayton and includes as defendants Delta Products Company, Office Supply and Equipment Company, and Wright Service Company, Inc. Delta, operating in Mississippi county, had sold to Arkansas Tuberculosis Sanatorium a quantity of oleomargarine for which the sanatorium was charged $392.40. This sale was made pursuant to a contract made by the state purchasing agent after public bids had been invited through statutory advertisement. The purchasing agent's contract with Delta was void, says the complaint, because J. H. Crain owns stock in Delta and Crain was a member of the highway commission.

Office Supply & Equipment Company, according to the complaint, had sold $97.31 worth of merchandise to the revenue department, and McCool was an officer of the equipment company and owned stock in the corporation.

Wright Service Company supplied the highway department with automobile tires to the extent of $36.25, and, it is urged, although the purchase was made "in the manner prescribed by law at what is known as the

'state price,' which is a special price offered . . .
and is lower than the usual retail market," yet J. Ed.
Wright, then an officer of the selling corporation, was
a member of the state racing commission "and will bene-
fit and profit directly or indirectly by said sale."

The prayer in all of the cases was that (a) if the
auditor had not converted the vouchers into warrants
that he be restrained from doing so; or (b) if the war-
rants had been issued, the treasurer should be enjoined
from paying them. As to some of the items in contro-
versy it was stipulated that no effort to collect would
be made until termination of the litigation.

Further transactions with Remington Rand were de-
veloped with proof showing a wide range of dealings,
one of the billings being for $78,840.32. It was sought
by the plaintiff in the Remington Rand-McCool dealings
to show that the cost of Dexigraph paper used for film-
ing was excessive and that non-competitive bids were
accepted; also that I. B. M. machines were cheaper and
more practicable. To these suggestions the defendants
asserted that I. B. M. machines were installed on a ren-
tal basis; that while the prices charged for camera sup-
plies, if considered alone, might be above the market
price if it should be assumed that films and paper made
by other manufacturers would be suitable, yet against
this *prima facie* figure there were other considerations,
such as installation of the necessary equipment and the
right to its use while the certificates were being
produced.

It is first argued that Act 214, if given the construc-
tion contended for by those seeking the injunction would
impair § 18 of Art. 2 of our constitution, and § 3 of
Art. 2; also that it would violate the Fourteenth amend-
ment to the U. S. constitution. The reasoning is this:
Following the substantive language of § 4 of Act 214
relied upon by those seeking the injunctions, § 5 pro-
vides that none of the Act's provisions shall apply
". . . to the offices and appropriations of the secre-
tary of state, attorney general, auditor of state, treas-

urer of state, lieutenant governor, state land commissioner, supreme court, the supreme court clerk, the circuit or chancery judges and prosecuting attorneys, or the general assembly."

Attention is directed to the language of § 18, Art. 2 of the constitution and its mandate that "The general assembly shall not grant to any citizen or class of citizens privileges or immunities which upon the same terms shall not equally belong to all citizens."

We have concluded that it is not necessary to say whether any of the constitutional provisions afford the relief requested. The answer to essential issues is found in the Act itself. Section 4 is subheaded, "Pre-Authorization of Expenditures." The pertinent portions of the section the plaintiffs sought to invoke begin with the fourth sentence of the fifth paragraph, (see p. 456 of the Acts of the Fifty-Fourth General Assembly, 1943) and are as follows:

"Neither the comptroller nor any member of his department, nor any officer, agent, or employe of any agency of the state making purchases shall be financially interested, directly or indirectly, in any contract or purchase order for any supplies, materials, equipment used by or furnished to any department or agency of the state government, nor shall the comptroller, any member of his department, or any agent or employe of any agency or department of the state, subject to the provisions of this Act, accept or receive, directly or indirectly, from any person, firm, or corporation to whom any contract or purchase order may be awarded, any rebate, gift, or otherwise any money or anything of value, or any promise, obligation, or contract for future reward or compensation. Any violation of this section shall be a felony and punishable accordingly."

Throughout the measure the term "agency subject to the provisions of this Act" repeatedly appears. It is contended that there was no intent to bring within the enactment duties incumbent upon the purchasing agent, and the same construction is urged in favor of agencies

required by prior laws to purchase through competitive procedure. We also pretermit a determination of this phase of the litigation.

We believe the answer is found in § 4, into which it is not reasonable to read a legislative intent to make felons of persons who in many instances had no effective means of ascertaining facts which would render illegal a course of conduct otherwise not forbidden. By this we do not mean to say that the general assembly is without power to prohibit the comprehensive transactions alluded to in § 4 in those cases where the means of obtaining information as to violations were charted; nor is the state without power to declare an office or position vacant where, without information upon the part of the officer or agent, the line of demarkation has been crossed.

The Act's primary function is clearly expressed in its title: ''To provide for budgetary control, to require pre-purchase authority, and for other purposes.'' Section 1 relates to a budgetary system. Administrative machinery for quarterly allotments is contained in § 2, while § 3 authorizes shifting of personnel and the transfer and sale of state-owned equipment. Section 5 creates the exceptions heretofore referred to and authorizes inter-administrative appeals. The whole tenor of the Act is what its title discloses—budgetary control and pre-purchase authority. The title reference to ''other purposes'' must be relied upon if the highly penal parts of § 4 are to be construed as the Attorney General and assisting counsel believe they should be. We find no persuasive support for this view.

Of course the legislature, in exercising the state's police powers, has a wide discretion within which it may determine what the public interest demands, and what measures are necessary to secure and promote such requirements. The only limitation upon power to enact statutes tending to promote the health, peace, morals, education, good order, and welfare of the public is that the legislation must reasonably tend to correct some evil and promote some interest of the commonwealth not vio-

lative of any direct or positive mandate of the constitution, [or a mandate necessarily implied]. *Harlow* v. *Ryland,* 78 Fed. Supp. 488, 172 Fed. 2d 784. But this power—that is, the police power as the term is generally defined—is not without limitations. *Bennett* v. *City of Hope,* 204 Ark. 147, 161 S. W. 2d 186.

We are not trespassing into an area of unreasonable deduction by assuming that the 54th General Assembly acted with full knowledge that its power to prescribe and proscribe was not absolute, hence we must assume that the promulgation.of Act 214 was with full legislative understanding of its purposes and intents. The lawmaking body must have been aware of § 10 of Act 65 of 1929, Ark. Stat's. § 76-215 by which members of the highway commission are required to swear or affirm (in addition to the constitutional oath) that they will not be interested either directly or indirectly in any contract made by the state highway commission, nor in the purchase or sale of any material, machinery or equipment bought for or sold by the commission while a member of said commission; that they will not be interested otherwise than as an official of the state in adding any road to the state highway system, or in the improving of any road by the state highway commission; nor in the appointment of any person to any position in connection therewith; "nor will I ever use any information or influence that I may have by reason of my official position to gain any pecuniary reward or material advantage to myself, or disclose such information that it may be used by others. So help me God."

Here we find the policy-declaring power operating directly and through express language upon members of the highway commission; but nowhere is there a suggestion that a commissioner shall not own stock in a corporation or be interested in an enterprise that sells to *another* department of the state; nor would he *ipso facto,* (e. g.) become a criminal if Westinghouse Electric Company (in which he owned stock) should sell its product to the state hospital.

The phraseology of an Act is the fundamental guide to legislative meaning and purpose, but it is language of the Act as a whole that must be read, "and not the words of a section or provision in isolation." *Elizabeth Arden Sales Corporation* v. *Gus Blass Co.,* 150 F 2d 988, 161 A. L. R. 370, 326 U. S. 773. Again it has been said that statutes should receive a common sense construction, and where one word has been erroneously used for another, or where a word has been omitted and the context affords a means of correction, the proper word will be deemed substituted or supplied. *Page* v. *Highway No. 10 Water Pipe Line Improvement District No. 1,* 201 Ark. 512, 145 S. W. 2d 344.

The contentions made by strict constructionists might have this result: Suppose the Game and Fish Commission should contract with Arkansas Power & Light Company not only for its lighting but for some special supplemental, but necessary, service; and suppose one of the commissioners happened to own a share of stock in the power company: has the commissioner committed a felony? The same analogy might with reason be applied to contracts for telephone service or for any utilities where the transaction does not pass through the secretary of state—an exempted official.

It has long been the rule that penal statutes and statutes which impose burdens and liabilities unknown at common law must be strictly construed in favor of those upon whom the burden is sought to be imposed, and nothing will be taken as intended that is not clearly expressed. *State* v. *International Harvester Co.,* 79 Ark. 517, 96 S. W. 119. See cases cited in West's Digest, Vol. 16, § 241.

It is urged by those who petitioned for injunctive relief that the criminal part of § 4 is not to be considered and that equity, independently of the felonious aspect, has jurisdiction to prevent payment of the questioned warrants and to restrain prospectively. *Ritholz* v. *Ark. State Board of Optometry,* 206 Ark. 671, 177 S. W. 2d 410.

We dispose of the cases by holding that the language of § 4 is not sufficiently clear to justify us in saying that the legislative intent was to prohibit the member of one board or commission, officer, agent, or employe, from consummating commercial or business transactions with another agency; therefore there was nothing tangible to prohibit.

This is not to say that in different circumstances involving collusion in matters detrimental to the public welfare the conduct would not be restrained if sufficient colorable design should be revealed.

The Chancellor's findings that the purchase orders were entered and their functions concluded "contrary to the express provisions of § 4 of Act 214" are reversed, but the refusal to enjoin is affirmed for the reasons herein expressed.

Remanded, with directions to enter orders not inconsistent with this opinion.

Mr. Justice Holt concurs.