The Honorable Wayne Dowd State Senator P.O. Box 2631 Texarkana, AR 75502
Dear Senator Dowd:
This is in response to your request for an opinion on thirty questions concerning Act 1306 of 1997, codified at A.C.A. § 2-40-801 et seq.
(Supp. 1997), which is entitled: "An Act to Prescribe Procedures for the Control and Eradication of Equine Infectious Anemia. . . ." ("The Act"). The questions are restated and answered below in the order posed.
Because many of the questions raise issues concerning the constitutionality of Act 1306, I must note as a threshold matter that in my opinion the Act is constitutional. It is my opinion that the general presumption of constitutionality is not overcome based upon the information and arguments presented under the questions addressed herein. It is of course well-settled that acts of the General Assembly are presumed to be constitutional and rationally related to a legitimate governmental objective. Teague v. State, 328 Ark. 724, ___ S.W.2d ___ (1997); Villines v. Tucker, 324 Ark. 13, 918 S.W.2d 153 (1996). This presumption places the burden of proof on the party challenging the legislation to prove its unconstitutionality. All doubts are resolved in favor of constitutionality. Misskelley v. State, 323 Ark. 449,915 S.W.2d 702 (1996).
I cannot conclude, in view of these precepts, that the general presumption of constitutionality has been overcome in this instance. The information presented simply does not, in my opinion, form a sufficient basis for concluding that the burden of proving the Act's unconstitutionality has been sustained. I lack both the resources and the authority, moreover, to act as a factfinder in developing further information to buttress the constitutional arguments that have been raised. With this being said, and with the understanding that in my view the presumption of constitutionality prevails, I will proceed to address your specific questions.
 1. May the Legislature impose a mandatory EIA testing law that causes extreme inconvenience and cost to owners of equidae in the absence of an epidemic or outbreak that threatens human and animal life? May the State order mandatory excessive testing when the enclosed official EIA test results for the past four years confirm our lowest infection rate ever?
As a general matter, it is my opinion that the answer to both parts of this question is in all likelihood "yes," pursuant to the "police power" of the state. It has been stated that the police power is "the greatest and most powerful attribute of government." 16A C.J.S. ConstitutionalLaw 392 (1984). The scope of the power is as broad as the public welfare or necessity. Id. at 396. It extends to the protection and promotion of the safety, health, comfort, and welfare of the community, and the protection of all property within the state. Id. at 399. And particularly significant for purposes of your question, "it may act to prevent apprehended dangers as well as to control those already existing." Id. at 394.
I thus cannot conclude that the absence of an epidemic or outbreak will necessarily defeat the equine infectious anemia ("EIA") testing law, which is enacted under the state's police power. The legislature has wide discretion in exercising the police power. Fiser v. Clayton,221 Ark. 528, 254 S.W.2d 315 (1953). Although this power is not without limitations (Bennett v. City of Hope, 204 Ark. 147, 161 S.W.2d 186
(1942)), it has been stated that the legislature's exercise of its discretion in this regard "will not be disturbed by the courts unless such regulation has no relation to the ends for which the police power exists." 16A C.J.S. at 442. In determining whether a law is within the police power, it is not necessary for the court to find that facts exist which would justify such legislation. Rather, it is enough if a state of facts can reasonably be presumed to exist which would justify legislation. Harlow v. Ryland, 78 F. Supp. 488 (E.D. Ark. 1948), affirmed172 F.2d 784 (8th Cir. 1949). Furthermore, when a subject lies within the police power of the state, "debatable questions as to reasonableness are not for the courts but for the legislature. . . ." Id. "[T]he presumption is in favor of the reasonableness and validity of the law, so that unconstitutionality must be clearly shown; and to justify interference by the courts, excessive and oppressive abuse of power must be shown." Id.
at 450-451. Stated further:
 The courts, in passing on the validity of statutes purporting to have been enacted under the police power, must disregard all matters that relate to the wisdom or policy of the act, and may declare the act void only when it clearly appears that it bears no real or substantial relation to the police power, or the means adopted for effecting the object are manifestly arbitrary and unreasonable[.]
Id. at 446. See also generally State v. Adams, 142 Ark. 411, 218 S.W. 845
(1920).
With regard to your specific questions, I cannot conclude that the Act is patently unreasonable or arbitrary based merely upon the characterization of the EIA testing as excessive in light of past test results. It is clearly within the power of the state to enact laws to prevent the spread of infectious or contagious diseases. See, e.g., Winters v. State,301 Ark. 127, 782 S.W.2d 566 (1990) (upholding former EIA testing provisions under the Arkansas Code). Thus, in the absence of a clear showing that the Act lacks any reasonable basis, the presumption of constitutionality must prevail.
 2. Under these conditions and state ordered testing may the State be held responsible for testing cost and indemnity for any owner loss of property resulting from State mandated testing?
It is my opinion that the answer to this question is "no," based upon the presumption of constitutionality attending the Act. The Arkansas Supreme Court has adhered to the rule that damage, loss, or injury from a valid exercise of the police power generally gives rise to no right to recover compensation. See, e.g., Burt v. Ark. Livestock Poultry Comm'n,278 Ark. 236, 644 S.W.2d 587 (1983); Yarbrough v. Ark. State Hwy. Comm'n,260 Ark. 161, 539 S.W.2d 419 (1976). See also generally 16A C.J.S. at 616-618 and 29A C.J.S. Eminent Domain § 8 (1992). I am aware of no authority for the proposition that the state must incur this testing cost. And the court in Winters v. State, supra, expressly rejected the argument that compensation was owing because of a "taking" under the former EIA testing law, stating:
 It has already been settled in Arkansas that a police power regulation for the health and welfare of the state which requires destruction of contaminated animals is not a taking, if the regulation is an otherwise valid exercise of the police power and if there is some residual value to the owner. Burt v. Arkansas Livestock Poultry Comm'n, 278 Ark. 236, 644 S.W.2d 587 (1983).
301 Ark. at 132-133.
 3. Are owners of equidae discriminated against when the Arkansas Livestock Poultry Commission provides testing, vaccination and diagnostic services free of charge to one or several species of livestock and not others?
The difference in the charge does not, standing alone, establish that the charge is discriminatory from a constitutional standpoint. Treating one species of livestock alike, even though they are not treated the same as another species, may be based upon a valid distinction. See, e.g., Burtv. Ark. Livestock Poultry Comm'n, supra (regarding different treatment of beef cattle owners and dairy cattle owners). The distinction is properly within the bounds of the equal protection provisions of the United States and Arkansas Constitutions as long as there is some reasonable basis for the different charges, such as the associated costs or any other factor "having a fair and substantial relationship to the purposes requiring such classification. . . ." Burt, supra,278 Ark. at 241.
 4. Does the State and/or its taxpayer supported agency, the Arkansas Livestock and Poultry Commission, discriminate against owners of equidae when they adopt an excessive testing charge of $26.00 for mandatory EIA testing and for equidae when they are currently providing essentially the same services free to owners of bovine? Does the adoption of a State EIA testing fee charge of $26.00 discriminate against owners when it has the effect of encouraging private sector vets currently charging $10.00 to $12.00 to escalate their fees to owners?
The answer to both of these questions is in all likelihood "no." See above discussion in response to Question 3. The conclusory statement that the testing charge is "excessive" does not, standing alone, establish its unlawfulness. While all of the surrounding facts would have to be considered, I believe it is likely that the state can demonstrate a rational basis for the different treatment, given the significant differences between the two species of livestock and the type of testing involved. With regard to the alleged effect of the charge on private sector fees, any such impact would, in my opinion, likely have no bearing on the constitutional issue.
 5. Does Section 1(a) [A.C.A. § 2-40-801(a)] discriminate against owners and their inherent constitutional right to use a licensed veterinarian of another state for their choice to conduct the mandatory EIA test? Is it constitutional for our State to honor EIA negative tests on out of state equidae conducted by out of State vets and forbid Arkansas owners the opportunity to use these same vets?
The answer to the first part of this question is, in my opinion, "no." A response to the second part of this question is unnecessary because, as discussed more fully below, it is premised upon the incorrect assumption that the Act prohibits the use of out-of-state laboratories or out-of-state veterinarians.
Section 1(a) of Act 1306, codified at A.C.A. § 2-40-801(a), defines "accredited veterinarian." While this definition limits the term to Arkansas-licensed veterinarians, there is nothing inherently discriminatory in this provision. Certainly, the practice of veterinary medicine in Arkansas is limited to Arkansas-licensed veterinarians. I find nothing in the Act, however, preventing owners from going to another state for testing. And I am informed that this is also the position of the Arkansas Livestock and Poultry Commission ("Commission"), which is vested with regulatory authority under the Act. See A.C.A. §2-40-803(a).[1] Under Section 2-40-804, "[o]wners of horses domiciled within the state [i.e., kept in the state more than thirty days] shall be responsible for maintaining a negative current official EIA test on all horses that they own." A.C.A. § 2-40-804(b) (Supp. 1997) (emphasis added). See also A.C.A. § 2-40-804(a) and (c) (regarding "written proof of a negative current official EIA test.") The test (defined at A.C.A. §2-40-801(t)) must be conducted by an "approved laboratory" (defined at A.C.A. § 2-40-801(d) as a lab "which is approved by the USDA and the State Veterinarian. . . .") I find nothing in these provisions preventing an Arkansas owner from going out-of-state for the official EIA test. It is my understanding in this regard that the State Veterinarian will recognize tests conducted by any laboratory which is approved by the USDA, including out-of-state laboratories. I believe this is within the State Veterinarian's approval authority under A.C.A. § 2-40-801(d), noted above, defining "approved laboratory." See also A.C.A. § 2-40-803(a) and n. 1, supra, regarding the Commission's regulatory authority.
It thus appears that your question is premised upon the incorrect assumption that the state will not honor a negative current EIA test conducted by an approved laboratory in another state.
It should perhaps also be noted, in addressing this question concerning the mandatory EIA testing, that the test is conducted by an approved laboratory and not ordinarily by the veterinarian. With regard to the drawing of blood for testing, A.C.A. § 2-40-807 provides that "[a]ll samples collected from equidae for equine infectious anemia testing shall be collected by an accredited veterinarian, State Veterinarian, or other Commission authorized personnel." I believe this provision is directed toward samples that are collected within Arkansas. The Commission clearly has regulatory authority in this regard. As stated above, however, I find no prohibition against owners taking their equidae to another state for testing. Section 2-40-807 does not, in my opinion, purport to impose such a prohibition. Nor, according to my understanding, does the Commission construe A.C.A. § 2-40-807 in this manner.
It may thus be concluded that neither A.C.A. § 2-40-801(a) (Section 1(a) of the Act), nor § 2-40-807 prevents the use of an out-of-state lab for testing or an out-of-state veterinarian for drawing samples.
 6. Does Section 1(a) [A.C.A. § 2-40-801(a)] violate our constitutional rights when Act 1306 mandates on the one hand a simple EIA test that can be conducted by an animal technician or other trained person, and, on the other hand, in Section 1(a) narrowly restrict and dictate that we must use a veterinarian licensed by the Arkansas Veterinary Examining Board?
The answer to this question is "no," as discussed above in response to Question 5. The Act requires proof of a "negative current official EIA test;" and as noted above, the definition of "[a]ccredited veterinarian" in A.C.A. § 2-40-801(a) does not mandate the use of an in-state laboratory or an in-state veterinarian for testing.
 7. Is Section 2(c) [A.C.A. § 2-40-804(c)] constitutional when it provides authority to private practicing vets, in the absence of written proof of a negative EIA test, when examining and treating Arkansas domiciled equidae, to conduct an official EIA test at owner expense, without the owners express consent for such test?
"Yes." This grant of authority is presumed constitutional as a proper exercise of the state's general police power.
 8. Is this authority found in Section 2(c) [A.C.A. § 2-40-804(c)], should it be exercised in this captive situation, unconstitutional and discriminatory since it effectively denies Arkansas owners the right to designate a vet for this test based on owner preference, a cheaper fee, or for other reasons?
"No." See response to Question 1.
 9. Is Section 2(c) [A.C.A. § 2-40-804(c)], which is applicable only to equidae domiciled in Arkansas, constitutional when the same testing authority under the same circumstances, is not applicable to out of state equidae under examination and treatment in Arkansas Vet Clinics and Hospitals?
In my opinion, "yes" it is constitutional. It is presumed constitutional, and I believe it is unlikely that the burden of challenging its constitutionality can be sustained simply by comparing this provision to the requirements applicable to equidae entering Arkansas "when consigned directly to a veterinary hospital or clinic." A.C.A. § 2-40-824 (Section 22 of the Act). This latter provision (§2-40-824) is probably premised, at least in part, upon the assumption that the risk of exposure under those circumstances is, relatively speaking, minimal. This appears reasonable on its face; and I lack sufficient information to conclude otherwise. In any event, the testing requirement for equidae domiciled within Arkansas is not thereby rendered unconstitutional.
 10. Is it constitutional for Section 22 [A.C.A. § 2-40-824] to exempt out of state equidae and their owners from the same testing authority provided for Arkansas domiciled equidae in Section 2(c) [A.C.A. § 2-40-804(c)]?
"Yes." See response to Question 9 regarding this section. There is in all likelihood a rational basis for each of these provisions. The difference in treatment is thus not alone determinative.
Because § 2-40-824 (Section 22 of the Act) is, accordingly, constitutional under the requisite presumption, it is my opinion that the answers to Questions 11, 12, and 13 are, respectively, "yes," "no," and "no."
 14. Does Section 5 [A.C.A. § 2-40-807] permit the use of animal technician employees of the Commission to collect blood samples on equidae and conduct lab test as they do on cattle?
I am somewhat uncertain what is meant by "animal technician employees." Section 2-40-807 provides that all samples shall be collected by, interalia, "commission-authorized personnel." The Act does not expand upon this authorization. Presumably, therefore, the Commission may determine who is authorized in this regard. It should be noted, however, that §2-40-807 only addresses the collection of blood samples; it does not specify or otherwise address who conducts lab tests.
 15. Does Section 3 [A.C.A. § 2-40-805] by reason of the definition of "accredited Veterinarian" in Section 1(a) [§ 2-40-801(a)] restrict commerce and effectively deny Arkansas owners the right to use licensed vets in another state?
It is my opinion that the answer to this question is "no." Although the term "accredited veterinarian" is defined in § 2-40-801(a) to mean an Arkansas-licensed veterinarian, § 2-40-805 provides that "an agent of the Commission" can also make the required identification. I am informed that the Commission interprets this as providing authority for a licensed accredited veterinarian in another state to make the identification. It thus appears that the use of other state veterinarians in this regard is not prohibited.
 16. Does Section 5 [§ 2-40-807], because of the definition of "accredited veterinarian" in Section 1(a) [§ 2-40-801(a)] unconstitutionally restrict the right of owners to use vets of their choice to conduct EIA test?
"No." See above response to Question 5.
 17. Does Section 10 [A.C.A. § 2-40-812], by requiring an excessive quarantine distance of 440 yards, which is 200 yards in excess of the safe quarantine distance recommended by EIA research, the USDA, and other states, constitute discrimination and deprive owners of their property without due process and just cause?
It is my opinion that the quarantine distance established by the General Assembly would, if challenged, likely be upheld in view of the courts' customary reluctance to make determinations concerning the policy, wisdom, or expediency of particular legislation enacted under the police power. See discussion, supra, in response to Question 1. Although the presumption of constitutionality is, as a general matter, rebuttable (see 16A C.J.S., supra, at 451), it has been stated that as long as the subject is within the police power, any exercise of the power is constitutional if there is a rational basis for the legislation. Id. at 449. Thus, as along as the 440 yard quarantine distance meets the minimal standards of rationality and reasonableness, it will be upheld. I lack specific facts to opine that this particular aspect of the Act is arbitrary or unreasonable, and must therefore defer to the aforementioned presumption of constitutionality.
 18. Does Section 10 [A.C.A. § 2-40-812] discriminate against majority owners by providing to owners of race horses grace not provided other owners?
I assume that this question is actually directed at Section 11 of Act 1306, codified at A.C.A. § 2-40-813, which requires in relevant part that "reactors stabled at a racetrack . . . shall be removed from the racetrack premises immediately." See A.C.A. § 2-40-813(a) (Supp. 1997). As noted in response to the next question, it is my opinion that there is no "grace" for race horses under the Act. With regard, specifically, to § 2-40-813, this section requires the immediate removal of positive reactors from the racetrack, as distinguished from other reactors which may be initially quarantined "to the owner's premises. . . ." See A.C.A. § 2-40-813(a). This section simply makes it clear that reactors at a racetrack may not be quarantined to the premises.
 19. Does Section 12 [A.C.A. § 2-40-814] discriminate against majority Arkansas owners of equidae by providing affluent race horse owners an alternative to slaughter for their positive reactors stabled at a racetrack that is not available to other owners?
It is my opinion that the answer to this question is "no" because Section 12, codified at A.C.A. § 2-40-814 (Supp. 1997), as construed by the Commission, provides no alternative to destruction or slaughter for reactors stabled at a racetrack. Although the punctuation in § 2-40-814
may raise a question in this regard, a reading of this provision together with other provisions of the Act supports the Commission's interpretation. I cannot, in any event, conclude that the Commission's interpretation is clearly wrong. See generally n. 1, supra.
Section 2-40-814 provides in relevant part:
 All equines stabled at a racetrack regulated by the Arkansas State Racing Commission which test positive to the official EIA test shall be immediately removed from the racetrack, shall be quarantined to the premises to which they are moved and shall be destroyed, branded by authorized commission personnel, sold for immediate slaughter or by permit shipped to an approved quarantined holding facility within twenty (20) days after the date of the last official positive EIA test.
While it might be contended based upon the placement of the commas in this paragraph that branding of racehorses by authorized personnel is an alternative to destruction or sale for slaughter, a reading of the Act as a whole indicates that branding is a requirement generally imposed in connection with the movement of reactors. See, e.g., A.C.A. § 2-40-816
(requiring that "[a]ll reactors must be branded prior to moving interstate[;]" A.C.A. § 2-40-817(b) (providing that "[a]ll equidae entering or within an approved quarantine holding facility shall be branded or show evidence of an `S' brand . . .;" and A.C.A. § 2-40-825
(requiring that "[a]ll equidae consigned to an approved slaughter facility must be properly and individually identified . . ." and that "[k]nown reactors must be branded. . . .") See also A.C.A. §2-40-820(a)(4) (authorizing, as an alternative to negative EIA test results, that equidae sold at approved markets "[b]e `S' branded and consigned to slaughter before receiving test results[.]")
The Commission thus interprets § 2-40-814, consistent with other sections of the Act, as requiring that reactors from a racetrack must be branded for identification purposes before they may be sold for slaughter or shipped to an approved quarantined holding facility.[2] It is my opinion that this interpretation is reasonable in view of the general rule that in determining legislative intent, each section of a statute is to be read in light of every other section, and the object and purposes of the statute are to be considered. See generally Chism v. Phelps,228 Ark. 936, 311 S.W.2d 297 (1958). There is no suggestion elsewhere in the act that the legislature intended an alternative to destruction or slaughter for a reactor. And I am reluctant to conclude based solely upon consideration of punctuation that such was the intent under § 2-40-814. The Commission's interpretation is, instead, highly persuasive and must be given great weight.
In response to your nineteenth question, therefore, it is my opinion that A.C.A. § 2-40-814 (Section 12 of the Act) provides no alternative to the destruction or slaughter of positive reactors stabled at a racetrack.
 20. May the Arkansas Livestock and Poultry Commission develop regulations that violate the 440 yard quarantine distance provision and permit livestock marketing facilities to stable positive and negative equidae in close proximity in a common facility several feet apart while denying owners the opportunity to quarantine positive reactors at a safe distance as an alternative to slaughter?
It is clear from A.C.A. § 2-40-820 that the 440 yard quarantine distance does not apply with respect to Commission-approved livestock markets. Reactors or exposed equidae that are consigned for sale at approved markets "must be maintained in quarantine pens and isolated from all other equidae in the sale facility." Id. at subsection (d). There is no reference in § 2-40-820 to a specific quarantine distance. The Commission EIA Regulations regarding Act 1306 of 1997 (issued July 10, 1997) provide in Paragraph 4 that "[t]he quarantine pen must be far enough from the area where negative tested animals are kept that, in the opinion of the inspector, the negative tested equidae will not be exposed." This addresses the isolation requirement in the Act. See A.C.A. § 2-40-820.
In response to your specific question, therefore, the regulations do not violate any quarantine distance provision with respect to livestock marketing facilities.
 21. May the Arkansas Livestock and Poultry Commission regulations violate the quarantine distance of 440 yards and Act 1306 quarantine intent by allowing positive and negative equidae to be hauled in a single common trailer from a livestock market facility to a far removed Arkansas destination that later permit the negative equine to be sold or traded over Arkansas?
I am unaware of any regulation to this effect with respect to hauling equidae. I am thus unable to respond to this question.
 22. May the Arkansas Livestock and Poultry Commission permit infected and clean equidae to be transported in a common trailer to and from a livestock marketing facility when it is common knowledge such horses in transit are inclined to bite, kick and skin one another thus promoting EIA infection through blood to blood contact?
See response to Question 21. I cannot address the expressed concerns in the absence of some reference to a rule or regulation evidencing the Commission's approval or permission in this regard.
 23. Is it constitutional for the Livestock and Poultry Commission to tax or access owners a $3.00 fee on all EIA test for specified and unspecified purposes without owner consent?
I am uncertain to which fee this question refers. Under paragraph 2 of the EIA regulations, supra, a $3.00 fee is assessed "to Arkansas licensed, practicing veterinarians for each Arkansas domiciled equidae tested for EIA." I believe such a fee is properly adopted under A.C.A. §2-40-826 (Supp. 1997) (Section 26 of Act 1306), which authorizes fees "[i]n order to fund or partially fund the Equine Infectious Anemia Control and Eradication Program. . . ."
 24. Is it constitutional for Act 1306 to ignore the safe quarantine distance of 200 yards defined by EIA research, the USDA, and most States and arbitrarily establish a 440 yard quarantine distance that is virtually impossible for most land owners to meet?
See response to Question 17.
 25. Is it constitutional for Act 1306 to retroactively impose the 440 yard on positive equidae quarantined under the previous law requirement of 200 yards?
It is my opinion that the answer to this question is likely "yes," given the presumption that Act 1306 is a valid exercise of the state's police power. Although retroactive legislation may not, as a general rule, disturb "vested rights" (16A C.J.S., supra at 314 and Jenkins v.Jenkins, 219 Ark. 219, 242 S.W.2d 124 (1951)), there is authority for the proposition that vested rights may be disturbed in some instances where an exercise of the police power is involved. Id. See also Op. Att'y Gen.90-289. This concept is summarized as follows:
 Under some authorities, the validity of retroactive legislation is determined by a consideration of its reasonableness; and whether the law is in furtherance of the police powers of the state; in this aspect, the courts compare the public interest in the law with the private interests that are overturned by it. The test is whether the legislation represents a rational means to achieve legitimate ends, not strictly whether the law abrogates a vested right.
 The criteria to be considered in determining whether the legislation can pass such test include the reliance interests of the parties affected, whether the private interest was in an area previously subject to regulatory control, the equities of imposing the legislative burdens, and the inclusion of statutory provisions designed to moderate the impact of the new law. Legislation readjusting rights and burdens is not unlawful solely because it upsets otherwise settled expectations. [Footnotes omitted.]
16A C.J.S., supra, at 313-314.
Although the requirements imposed under Act 1306 are clearly more burdensome than the previous regulations, it is my opinion that the act in all likelihood passes the above test and is constitutional on its face.
 26. Is it constitutional for Act 1306 to deny owners of positive reactors the opportunity to provide reasonable safe 200 yard quarantine as an alternative to slaughter? Does the absence of a quarantine provision deprive owners of their property without due process and good cause? Does lack of a safe quarantine provision in Act 1306 constitute cruel and in humane treatment to owners and equidae alike for no good reason?
Because I lack both the resources and the authority to act as a factfinder, I must conclude in response to these questions concerning the absence of a quarantine provisions that the Act is constitutional on this subject. As noted above, in response to Question 1 regarding the police power of the state, when a subject lies within the police power, the courts will generally not entertain debatable questions as to the reasonableness of a particular exercise of the power. Thus, unless it is shown that there is no reasonable basis for the absence of a quarantine provision, the court will not address arguments concerning the wisdom or expediency of the Act. The presumption of constitutionality will, instead, prevail.
 27. Is Section 3 [A.C.A. § 2-40-805] identification requirement" that all equidae domiciled within Arkansas and over the age of six months or weaned from mare shall be positively identified on an official test form by an accredited veterinarian ". . . . constitutional since this section, by reason of the definition of "accredited veterinarian" in Section 1(a) [A.C.A. § 2-40-801(a)] effectively fails to recognize as valid an EIA test conducted on Arkansas domiciled equidae by a vet not licensed by the Arkansas Veterinary Board?
I believe the assumption under § 2-40-805 is that equidae domiciled within Arkansas will be tested in the state. This section does not, however, in my opinion, purport to prohibit out-of-state testing. It only addresses identification requirements. Even if it were construed to address identification requirements in connection with all EIA testing, regardless of where conducted, the Commission could, it seems, recognize a licensed veterinarian from another state as an "agent of the Commission" under this Section.
Thus, in my opinion, A.C.A. § 2-40-805 (Section 3 of the Act) does not deny an owner the opportunity to use a licensed veterinarian of another state.
 28. Is Section 16 [A.C.A. § 2-40-818] constitutional when it excludes a market facility and vet from any liability for any erroneous information they or their employees may have improperly recorded or caused?
Section 2-40-818 provides that "[n]o livestock auction facility operator or veterinarian may be held responsible for recording erroneousinformation provided by an owner, buyer or seller." (Emphasis added). That is the extent of the exclusion from liability. This provision does not appear to address a scenario where the information provided by the owner, buyer or seller is correct, but the auction facility operator or veterinarian records it improperly. I cannot speculate whether any liability would result under that scenario.
 29. Is Section 8 [A.C.A. § 2-40-810] constitutional when it directs that the veterinarian collecting the retest sample will be furnished with documentation that the animal being retested is the one shown positive on the initial test? This in effect destroys the "second opinion" theory and purpose of the retest.
You have not suggested a specific basis for challenging the constitutionality of this requirement, nor do I perceive a constitutional problem in this regard.
 30. Does Section 2(b) [A.C.A. § 2-40-804(b)] violate owners rights to privacy and confidentiality when neighbors are provided the right to know if your equidae are tested or untested for EIA?
It is my opinion that the answer to this question is "no." It is unlikely that the asserted privacy rights in this regard rise to a level protected by the constitutional right to privacy doctrine.[3] Any privacy rights in this regard are, moreover, subject to the legitimate exercise of the police power of the state, discussed more fully above.
The foregoing opinion, which I hereby approve, was prepared by Assistant Attorney General Elisabeth A. Walker.
Sincerely,
WINSTON BRYANT Attorney General
WB:EAW/cyh
[1] The Commission's interpretation of the Act will, under established rules of statutory construction, be given great weight and will not be overturned unless clearly wrong. See generally Douglass v. DynamicEnterprises, Inc., 315 Ark. 575, 869 S.W.2d 14 (1994).
[2] In accordance with A.C.A. § 2-40-817(a), all equidae held in a quarantined holding facility "must be shipped direct to an approved slaughter facility without diversion."
[3] The United States Supreme Court has held that the right to privacy guaranteed by the Fourteenth Amendment to the United States Constitution includes only personal rights that can be deemed "fundamental" or "implicit in the concept of ordered liberty." Roe v. Wade, 410 U.S. 113
(1973). The Arkansas Supreme Court has recognized the protectability of individuals' privacy interests only in situations where the matter at issue was of an extremely personal nature, and where the harm that could result from release of the information outweighed the importance of its released. See, e.g., McCambridge v. City of Little Rock, 298 Ark. 219,766 S.W.2d 909 (1989).